IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AMY CROCKETT, as Administrator of the ESTATE of KEO CROCKETT, Deceased, and AMY CROCKETT, in her individual capacity, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:18-cv-809 |
| CHARLES BLACKWOOD, in his official capacity as Orange County Sheriff, DUKE ASHLEY, in his individual capacity, TYLER CHELENZA, in his individual capacity, and TRAVELERS CASUALTY AND SURETY CO. OF AMERICA, as surety, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Keo Crockett ("Crockett" or "Mr. Crockett") was shot to death on his front porch by Deputy Duke Ashley of the Orange County Sheriff's Department on the night of February 18, 2017. (ECF No. 19.) Mr. Crockett's widow, Amy Crockett ("Ms. Crockett" or "Plaintiff"), brings this action pursuant to 42 U.S.C. § 1983, alleging a violation of the United States Constitution, as well as various state law claims.[1] (*Id.*) Before the Court is Defendants' Motion for Summary Judgment on all claims.[2] (ECF No. 23.) For the reasons set forth below, Defendants' motion will be granted in part and denied in part.

---

[1] Ms. Crockett brings her claims individually and as administrator of Mr. Crockett's estate.

[2] Defendant Travelers Casualty and Surety Company of America ("Travelers") serves as the surety for Defendant Charles Blackwood's ("Blackwood") bond, against which Plaintiff seeks to collect. (*See* ECF No. 19 ¶ 13.)

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant"—here, Ms. Crockett—and to "draw all reasonable inferences in [her] favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015)). "[T]hat obligation does not give way to a court's doubts about the credibility of a nonmoving party's account." *Id.* Where, as in this case, qualified immunity has been raised by the defendants, this "usually means adopting . . . the plaintiff's version of the facts," even if it seems unlikely that the plaintiff would prevail at trial. *See id.* at 276 (quoting *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011)).

## II. FACTS

Many of the facts surrounding the death of Mr. Crockett are uncontested. In February of 2017, Ms. X[3] began to suspect that her boyfriend, Keo Crockett, was living with another partner. (ECF No. 23-5 at 5.) After trying to break up with Crockett, Ms. X resumed seeing her former partner, David Parker ("Parker"), with whom she had previously had a child. (*Id.*) On the night of Saturday, February 18, 2017, Ms. X, Parker, and their young daughter drove to Ms. X's home in Mebane, North Carolina where they spotted what appeared to be Crockett's car in the driveway. (*Id.*) The group decided to keep driving to Parker's home, also

---

[3] The Court will, as the parties have done, refer to one of the individuals involved in these events as "Ms. X."

located in Mebane. (*Id.*) Upon arriving at Parker's residence, Ms. X and her daughter laid down in the bedroom. (*Id.* at 6.) A few minutes later, Crockett entered the home with his gun drawn, put it to Parker's head, and marched Parker backwards into the bedroom. (ECF No. 23-4 at 5.) As Ms. X tried to shield her daughter's eyes from the traumatic scene unfolding, Crockett berated X and Parker, pointing his gun at them and demanding of X "[a]re you defending him?" (ECF Nos. 23-4 at 6; 23-5 at 6.) Crockett then put Parker in a headlock and announced "I should just fucking kill you right now," before pushing Parker into his dresser and leaving the home. (ECF Nos. 23-4 at 6; 23-5 at 6.) Parker immediately called the police to report the incident, informing the operator that Keo Crockett was the perpetrator. (*See* ECF No. 23-4 at 15–16.) Parker placed this call at 10:23 p.m. (*Id.* at 15.) The police soon arrived at Parker's home to investigate and Ms. X provided them with a phone number for Crockett and with his address in nearby Efland. (*See* ECF No. 23-5 at 9, 19.)

After the altercation in Mebane, Crockett drove home, arriving sometime between 10:30 and 11:00. (*See* ECF Nos. 19 ¶ 30; 23-3 at 10.) Crockett joined his wife in bed in their guestroom where she had fallen asleep watching television. (ECF No. 23-3 at 9–10.) To an observer facing the home, the Crockett's guestroom was on the front of the right side of their home, with a window facing out onto the front porch. (*Id.* at 14.)

Around the time the couple was in the guestroom, law-enforcement officials mobilized to arrest Crockett. (*See* ECF No. 23-1 at 5.) As Crockett lived in Orange County but had threatened X and Parker in Alamance County, the Mebane Police Department first sent out a "BOLO" or "be on the lookout" to Orange County informing it that Keo Crockett was a suspect in a home invasion, that he had used a firearm, and that he "should be considered

armed and dangerous."[4]  (*See id.*)  The BOLO also advised that law enforcement officers in

Mebane were "in the process of taking out warrants for [Crockett]" and requested that Orange

County officers find and hold Crockett.  (*Id.*)  Orange County officials then broadcasted this

message to their officers in the field and further advised that the Mebane Police Department

had requested that deputies go to Crockett's home at 306 Virginia Lee Lane to try to locate

him.  (*Id.*)

Five officers—Sergeant Ryan Jones ("Jones"), Corporal Tyler Chelenza ("Chelenza"),

Deputy Ashley ("Ashley"), Deputy Ethan Campbell, and Deputy Trent Hall—then met in a

staging area to plan their approach to Crockett's home.  (*Id.* at 4.)  As the leading officer,

"Sergeant Jones . . . devised the plan."  (*Id.* at 5.)  The plan called for Ashley and Chelenza to

knock on the front door of the residence to "try and make contact with Mr. Crockett."  (*Id.* at

6.)  Meanwhile, the other officers "were supposed to cover the back of the house."  (*Id.*)  The

officers further decided to employ a "stealthy approach," foregoing flashing lights and parking

"approximately three houses down" from Crockett's home—apparently some distance as

homes in the neighborhood are spread out from one another.  (*Id.* at 8, 20–21.)  The officers

hoped this surreptitious tactic would minimize their exposure to any incoming fire from

Crockett.  (*Id.* at 8.)

As Ashley and Chelenza approached the house, they "noticed that there was a light

shining on the house," and Chelenza unplugged it.[5]  (ECF Nos. 23-1 at 7; 23-2 at 15.)  After

---

[4] It is uncontested that Crockett did not actually discharge his weapon at Parker's home.

[5] Officers Ashley and Chelenza offer conflicting explanations for this decision.  Ashley recalls
expressing a concern to Chelenza that the light was "lighting [him] up on the porch" leaving him
"exposed."  (ECF No. 23-1 at 7.)  Chelenza, however, states that he turned off the light to make
Ashley *more* visible to individuals inside the residence.  (ECF No. 23-2 at 6.)

unplugging the Crocketts' exterior light, Chelenza took up a position to the left of the front porch, facing the house. (ECF No. 23-2 at 4, 15.) Meanwhile, up on the porch, Ashley knocked once on the front door and once on a front window. (ECF No. 23-1 at 21.) Ashley did not announce that he was the police. (ECF No. 28 at 6.) What happened next is subject to serious dispute, with Plaintiff and each of the defendant officers providing different accounts of the moments that followed Ashley's rap on the window.

According to Plaintiff, the Crocketts decided to move across the hall to their master bedroom around 11:00. (ECF No. 23-3 at 10.) At that time, the two heard a tapping noise that sounded like someone trying to break into their home through the guestroom window. (*Id.* at 15, 18.) Though the couple could not see who or what was making the disturbance because their blinds were closed, they suddenly became aware that the exterior lights they had installed outside their home were off. (*Id.* at 15, 42.) Now suspecting that someone was trying to break in, Crockett retrieved a gun from the master bedroom. (*Id.* at 18, 42.) Crockett then walked to the front door to investigate with Ms. Crockett following behind him. (*See id.* at 42.)

According to Plaintiff, Crockett opened his front door with his left hand while holding his gun behind him in his right hand so that the gun faced backwards and towards the floor. (*Id.* at 30, 32.) He then stepped—at most—a foot onto the porch, turning his body toward the left, and was shot. (*Id.* at 21, 23, 31.) As Plaintiff "turn[ed] instinctively and [began to] run," she heard her husband cry, "Oh God, I've been shot. Run baby." (*Id.* at 23.) Ms. Crockett fled back into her guestroom where she tried to hide while calling 911 to report that someone had broken in and shot her husband. (*Id.* at 23–24.) She quickly hung up the phone hoping the intruder or intruders would not find her, but an armed man entered the room, pointed a gun at her head, identified himself as the "police," and handcuffed her behind her

back. (*See id.* at 23, 25–26.) Still terribly confused, Plaintiff informed the police that "[s]omebody" had just shot her husband. (*Id.* at 26.) The police then took Plaintiff through her house and down the back steps and placed her in the rear of a police car. (*Id.*) Her husband died on the scene. (ECF No. 19 ¶ 57.)

Plaintiff states that all of this transpired without her hearing the police issue a warning or a command of any kind. (ECF No. 23-3 at 23.) She further states that her husband was shot "instant[ly]" or perhaps within a second of opening his front door. (*Id.*) Though Ms. Crockett's view was not totally unobstructed, she says that she could always see Crockett's gun and some part of her husband until the shots were fired and that Crockett never raised his gun or even "had any opportunity" to do so. (*See id.* at 22, 31, 33, 42.)

Ashley's account differs from Plaintiff's. He states that after he knocked on the door and window, he took up a position on the right side of the front porch between the door and the guestroom window. (ECF No. 23-1 at 9.) He heard "some rustling noises" a "rustling noise," and though he did not hear Crockett come to the door, "a few seconds" later, Crocket opened the door "with force." (*Id.* at 9, 11.) While Crockett's revolver was at his side when he entered the porch, within a step or two and "a half a second" he lifted it and pointed it directly at Ashley. (*Id.* at 10, 16–17.) Ashley raised his AR-15 rifle from its "low-ready position," turned on the rifle's flashlight, saw Crockett's gun was loaded, and "began to squeeze the trigger." (*Id.* at 10–11.) As Crockett fell to the floor and began to moan, Ashley repeatedly ordered him to drop his gun. (*Id.* at 11, 13.) After Crockett relinquished his grip on the revolver, Ashley "drug" it away from him, stepped over his body, and entered the home where he found Plaintiff, "grabbed her by the arm, walked her back through the doorway and

passed her off" to another deputy.  (*Id.* at 13–14.)  In all, Ashley shot Crockett four times.  (*Id.* at 15.)  He states that he never commanded Crockett to drop his weapon.  (*Id.* at 10.)

Chelenza's account corroborates Ashley's account on its most crucial point: he agrees that Crockett raised his firearm and pointed it directly at Ashley.  (*See* ECF No. 23-2 at 5.)  It differs, however, in several important ways.  First, Chelenza states that before Crockett opened the door, Ashley announced "[c]ome on out, Bud" and that once Crockett emerged, Ashley said "'show me your hands' twice in rapid succession."  (*Id.*)  Officer Chelenza also states that Crockett was "almost completely out of the doorway" when he was shot, that he heard the "heavy footsteps" of someone "walking with haste towards the door," and that Ashley already had his flashlight on before the door opened.  (*See id.* at 5, 7–8.)

The three surviving individuals who witnessed the shooting offer different and plausible perspectives, creating genuine factual disputes as to (1) the speed and force with which Mr. Crockett approached his front door;[6] (2) where Crockett was on the porch when he was shot; (3) whether his gun was raised; and (4) how the officers behaved in the seconds leading up to his shooting, including whether Ashely asked Crockett to come outside and whether Ashely demanded that Crockett put up his hands before shooting him.  In keeping with the principal that "at the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party'" when they are genuinely disputed, the Court will therefore

---

[6] Chelenza states that he heard heavy footsteps rapidly approaching the door—a fact from which a reasonable jury could infer that Crockett was rapidly exiting his house in an aggressive manner—but Ashley, who was closer to the door and thus in a better position to hear such noises, testified that he did not hear Crockett coming, a fact from which a reasonable jury could conclude that Crockett was not moving with any great rapidity or force.

adopt Plaintiff's version of the facts and analyze her claims in that favorable light. *See Witt*, 633 F.3d at 276–77 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III.  DISCUSSION

Defendants now move for summary judgment asserting a variety of defenses to liability. The Court will first discuss all federal claims against the Defendants before analyzing Plaintiff's state claims.

### A. Fourth Amendment Claim Against Ashley in His Individual Capacity

Plaintiff first sues Ashley in his individual capacity pursuant to Section 1983 for violating Crockett's Fourth Amendment right to be free from the use of excessive force.[7] (*See* ECF Nos. 19 ¶¶ 58–66; 32 at 8–17.) Defendants move for summary judgment on the grounds that Ashley is entitled to qualified immunity. (ECF No. 23 at 1.) As explained below, the Court disagrees with Defendants.

Section 1983 states that "[e]very person who, under color of [state law] . . . subjects . . . any citizen . . . or other person . . . to the depravation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. As interpreted by the Supreme Court, the act provides for "qualified immunity," a doctrine that "shields government officials from liability for civil damages, provided that their

---

[7] Plaintiff also appears to have sued Defendants Blackwood and Chelenza for violating Crockett's Fourth Amendment rights. (ECF No. 19 at 8.) However, in Plaintiff's response brief in opposition to Defendants' motion for summary judgment, Plaintiff clarified that she "did not intend to allege such a claim" against Blackwood and that "the claim for excessive force against [Chelenza] may properly be dismissed." (ECF No. 32 at 8, 17.) Accordingly, the Court will grant Defendants' motion for summary judgment as to these claims. Furthermore, though Plaintiff's amended complaint appears to argue that Defendants' actions violated Crockett's Fifth and Fourteenth Amendment rights, (*see* ECF No. 19 ¶ 63), Plaintiff waived these claims in her response, stating that "[t]he Fourth Amendment . . . provides the basis for the claims asserted in this case." (*See* ECF No. 32 at 8.) Thus, the Court will grant Defendants' motion for summary judgment as to these claims.

conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person."[8] *Myers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013).

In *Saucier v. Katz*, the Supreme Court articulated a two-step procedure for resolving officers' qualified immunity claims.[9] *See* 533 U.S. 194, 201 (2001). First, the Court must determine "whether a constitutional violation occurred." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). At the summary judgment stage, this means asking whether, "viewed in the light most favorable to the plaintiff[,] . . . [the facts] demonstrate a violation of the plaintiff's constitutional rights." *Harris*, 927 F.3d at 270. Second, the Court must examine "whether the right violated was clearly established"—that is, "sufficiently clear that every reasonable official would have understood" that his behavior violated the right at issue. *See Henry*, 652 F.3d at 531; *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016). This standard does "not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Rather, "[w]hat matters is that it would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted." *Livingston v. Kehagias*, __ F. App'x __, 2020 WL 898092, at *10 (4th Cir. Feb. 25, 2020) (internal quotations omitted). To overcome a qualified immunity defense, a plaintiff must prevail on both *Saucier* steps. *See* 533 U.S. at 201. The Court will therefore start by considering whether the facts alleged by Plaintiff show that Ashley violated Crockett's Fourth Amendment right to be free of excessive force.

---

[8] Qualified immunity is meant to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably"; the primary concern being, that absent the immunity, the fear of civil lawsuits would "dampen the ardor" of law enforcement officers. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

[9] The Court has discretion to address each prong in the order "that will best facilitate the fair and efficient disposition of each case." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (quoting *Pearson*, 555 U.S. at 242).

1.  Was excessive force used?

"The Fourth Amendment prohibits law enforcement officers from using excessive or unreasonable force in the course of making an arrest or otherwise seizing a person." *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019). "To determine whether an officer's use of force is excessive, [courts] apply a 'standard of objective reasonableness.'" *Harris*, 927 F.3d at 272 (quoting *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002)). In applying this standard, courts consider the three factors set forth in *Graham v. Connor*: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219–20 (4th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Regarding the first *Graham* factor, Crockett was suspected of committing a very serious crime—the police believed he had invaded a home, brandished a firearm, and threatened two individuals; they also mistakenly believed he had discharged his weapon.[10] *See id.* at 220 (finding that assault after forced entry into a home was a severe crime). Thus, the first *Graham* factor weighs in Ashely's favor.

Application of the third *Graham* factor is similarly straightforward: viewed in the light most favorable to Plaintiff, Crockett was not resisting arrest or attempting to flee the police. Indeed, the undisputed facts indicate that the police were not even trying to arrest Crockett and that the Crocketts did not know that their unseen assailants were police officers. Thus, the third *Graham* factor tends to show that Ashely's use of force was excessive.

_____

[10] *See supra* n.4.

The second *Graham* factor—whether Crockett posed an immediate threat to the safety of the officers or others—however, "is undoubtedly the 'most important' [factor] in determining the objective reasonableness of an officer's use of force," *see Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)), and its application to the facts at hand is less clear cut.

As a threshold matter, under Fourth Circuit precedent, "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). Rather, in order to use deadly force against a suspect possessing a firearm, "an officer must make a 'reasonable assessment' that he or another, has been '*threatened* with the weapon.'" *Betton*, 942 F.3d at 191 (quoting *Cooper,* 735 F.3d at 159).

Here, viewing the record in the light most favorable to Plaintiff, Crockett stepped out into the frame of his front door holding a gun down to his side to investigate what he perceived to be a night prowler and was shot without warning by an officer who suspected him of having committed a violent crime. Crediting Plaintiff's version of events and making all reasonable inferences in her favor, Crockett never raised his gun and Ashley never identified himself or warned Crockett, though he had time to do so.[11] Thus, the question for the Court is whether a reasonable officer facing these circumstances would believe that Crockett posed an immediate threat to the safety of Ashley or others. In answering this question, the Court finds three opinions particularly instructive.

---

[11] While all parties agree Crockett was shot soon after opening his door, the Court can easily infer that the police had time to warn Crockett because Chelenza testified in his deposition that Ashley twice instructed Crockett to raise his hands before shooting him. (*See* ECF No. 23-2 at 5.)

First, in *Cooper v. Sheehan*, the Fourth Circuit held that officers deployed excessive force

when they shot a man, George Cooper, who was standing "at the threshold of his home,

holding [his] shotgun in one hand, with its muzzle pointed at the ground." *See* 735 F.3d at

159. The facts of *Cooper* are tragically similar to the instant litigation:

> There, the officers responded to a domestic disturbance at Cooper's home.
> Rather than announce their presence, one officer simply tapped on the window
> of Cooper's home with his flashlight. In response, Cooper peered out the back
> door and called out for anyone in the yard to identify himself, but the officers
> did not respond. Faced with silence, Cooper went outside to investigate the
> noise and brought with him a twenty-gauge shotgun. With the butt of the
> firearm in his right hand and its muzzle pointed toward the ground, Cooper
> opened the back door and took two or three steps on to his darkened porch.
> By that time, the officers were out of Cooper's line of sight; nor could they see
> him. When Cooper came upon the officers, reacting to the sight of Cooper and
> his shotgun, the officers drew their service weapons and commenced firing
> without warning.

*See Hensley v. Price*, 876 F.3d 573, 583 (4th Cir. 2017) (internal alterations, quotations, and

citations omitted) (summarizing the facts of *Cooper*). In concluding that the officers had

violated the Fourth Amendment, the Fourth Circuit first emphasized that Cooper held his gun

to the ground, "ignored no commands," and made no "sudden moves" or "threats." *Cooper*,

735 F.3d at 159. The Court then highlighted the "important" fact that "the [o]fficers never

identified themselves—even when asked by Cooper." *Id.* This mattered because if the officers

had identified themselves, "they might have been safe in the assumption that a man who greets

law enforcement with a firearm is likely to pose a deadly threat." *Id.* However, given that they

did not identify themselves, the officers should have been aware that Cooper had a "perfectly

reasonable rational for bearing a firearm while investigating a nocturnal disturbance on his

own property." *Id.* at 160 (quotations omitted).

Second, in *Hensley v. Price*, the Fourth Circuit held that officers used excessive force when, without warning, they shot a man, David Hensley, who was walking toward them with a handgun pointed at the ground after seeing Hensley strike his daughter with the gun. *See* 876 F.3d at 578, 582. In explaining its decision, the Fourth Circuit first declined to conclude that because Hensley committed one violent act—hitting his daughter with a gun—he would "take the substantial step of escalating" private—though no doubt extremely serious— violence against his daughter "into a potentially deadly confrontation with two armed police officers." *Id.* at 584. It then admonished the officers for failing to warn Hensley or to order him to drop the gun, citing the Supreme Court's declaration in *Tennessee v. Garner* that a warning should be given before deadly force is used, providing a warning is feasible. *See id.* (citing 471 U.S. 1, 11–12 (1985)). Thus, the Fourth Circuit concluded, a reasonable jury could find that "because Hensley never raised the gun to the officers, and because he never otherwise threatened them, the [officers] shot Hensley simply because he had possession of a firearm." *Id.* at 583. Such conduct violated the Fourth Amendment. *Id.*

Finally, in *Betton v. Belue*, the Fourth Circuit held that a plain clothes officer used excessive force when he burst into David Belue's apartment without identifying himself and then shot Belue when Belue emerged from the back of his home holding a gun at his waste to investigate the disturbance. *See* 942 F.3d at 187–188. The Fourth Circuit viewed its previous decision in *Cooper* as dispositive in *Betton*, holding that the officer's actions were unreasonable because he did not announce his presence or issue any commands to Belue. *Id.* at 191, 193. These failures "rendered [the officer's] use of force unreasonable." *Id.* at 193.

In applying these cases to the facts of this litigation as presented by Plaintiff, it is apparent that Ashley lacked a reasonable basis for concluding that Crockett was threatening

him with a weapon. Just as in *Cooper*, Crockett held his gun down, ignored no commands, and made no sudden moves or threats. Even if the Court concluded that Crockett took a step or more onto the porch—which would be inappropriate at this juncture as both Plaintiff and Chelenza have testified that Crockett was shot while essentially standing in his doorway—this minor movement into the officers' view would not constitute a "sudden move" to justify use of deadly force. In *Cooper*, George Cooper also suddenly came into view of the officers who shot him after taking several steps onto his unlit porch. *See Cooper*, 735 F.3d at 155–56. Likewise, just as in *Cooper*, the officers in this case never identified themselves to Crockett, despite the fact that they had the opportunity to do so while waiting on the porch and even had his phone number and so could have called him from out of harm's way. Instead, the officers took the time to develop and execute what the State Bureau of Investigation's agent responsible for investigating the shooting later characterized as a "bad plan." (*See* ECF No. 23-6 at 20.) They crept up to Crockett's house under the cover of night, accentuated the dark by unplugging his exterior light, rapped on his window, and then shot him when he walked outside. This "bad plan" matters because binding circuit precedent holds that it is more reasonable for officers to shoot individuals who knowingly confront law enforcement officers with weapons than it is for them to shoot men like Crockett who answer the door of their home armed to confront unknown threats. *See Cooper*, 735 F.3d at 159–60; *see also Betton*, 942 F.3d at 194 (explaining that officers "could have announced police presence at any time before shooting Betton . . . [thus] alleviating Betton's then-justified concern to protect himself from the unknown intruders"). Furthermore, just as in *Hensley*, Ashley had time to issue a warning or a command before he used deadly force yet, by his own admission, he did not do so.

In attempting to distinguish the authorities cited by Plaintiff, Defendants stress a line in *Cooper* stating that the *Cooper* officers "had no other information suggesting that Cooper might harm them." (*See* ECF No. 28 at 17–18 (quoting 735 F.3d at 159).) Here, Defendants argue, the officers had ample reason to think that Crockett might harm them, principally that he had just committed a violent crime. (*Id.*) The Fourth Circuit, however, has already considered and rejected the proposition that a suspect's recent violent conduct was sufficient to distinguish a case from *Cooper*. It held in *Hensley* that the decision of police officers to shoot a man who had just pistol-whipped his daughter in their presence and who was advancing forward with his gun down, but who was not otherwise posing an immediate threat, ran "headlong into our holding in *Cooper*: 'the mere possession of a firearm by a suspect is not enough to permit the use of deadly force.'" *Hensley*, 876 F.3d at 585 (quoting *Cooper*, 735 F.3d at 159). Here, just as in *Hensley*, a suspect's prior violent act—Crockett's invasion of Parker's home—does not fundamentally distinguish the case from *Cooper* where the decedent had not recently committed a violent crime.

In conclusion, the Court finds (1) that the crime at issue in this case was serious, (2) that Crockett was not attempting to escape or resist arrest, and (3) that Ashley's assessment that Crockett posed an immediate threat to him was unreasonable. The Court therefore finds that Ashley violated Crockett's right to be free from excessive force. Though officers tasked with policing situations where arms are likely present must occasionally make split-second decisions with their lives on the line, the Fourth Amendment does not permit officers to shoot suspects who, with their guns down, step onto their porches to investigate threatening noises and, in doing so, make no sudden moves or threats, ignore no commands, and receive no

warnings. The Court will therefore turn to the second step of the *Saucier* analysis and consider whether this law was clearly established on the night Crockett died.

2. Did Ashley violate clearly established law?

In determining whether Officer Ashley's conduct violated a clearly established constitutional right, the Court can only consider decisions like *Cooper*, a 2013 case, that were issued before the events of February 18, 2017—it cannot consider *Hensley* or *Betton*, which came out following the shooting in question. *See Betton*, 942 F.3d at 194 n.4. The Court must also be careful "not to define clearly established law at a high level of generality." *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The Court will therefore determine whether it was clearly established in February of 2017 that shooting an individual was unconstitutional after the officer (1) entered the suspect's property and (2) turned off the light illuminating the suspect's house, (3) rapped on the suspect's door and window without identifying himself, (4) observed the suspect open his door and take a step forward with a gun pointed down, all while (5) failing to give any commands or warnings despite having time to do so.

Though the facts of *Cooper* are not on all fours—chiefly because there is no analogue in *Cooper* to the officers' decision to turn off Crockett's light and because Crockett was suspected of a serious violent crime—the core of *Cooper*, the "right to be free from deadly force when posing no threat," is present here. *See* 735 F.3d at 160. Here, as in *Cooper*, the officer stole onto the suspect's property, failed to identify himself, and then shot the suspect when he emerged from his home with a gun pointed down to investigate the police-caused disturbance, despite the fact that the suspect made no sudden moves, ignored no commands or warning, and did not otherwise threaten the officer. As a result, viewing the evidence in the light most favorable to Plaintiff, Ashley violated Crockett's clearly established right to be

free from excessive force and is therefore not protected by qualified immunity. The Court therefore concludes that Ashley is not entitled to summary judgment as a matter of law on Plaintiff's excessive force claim.

### B. Fourth Amendment Claim Against Blackwood in His Official Capacity

Plaintiff also appears to sue Orange County Sheriff Blackwood in his official capacity for violating Crockett's Fourth Amendment rights.[12] (*See* ECF No. 19 ¶¶ 5, 58–66.) While Plaintiff candidly concedes that her evidence to support this claim is "minimal," she argues that Sheriff Blackwood should be held liable for the tragic consequences of his officer's "preconceived plan to furtively apprehend Mr. Crockett." (ECF No. 32 at 17.)

"[A] plaintiff may bring a Section 1983 action against governmental officials in their official or representative capacity." *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013). A Section 1983 action "against a Sheriff, in his official capacity, constitutes a suit against the 'entity of which an officer is an agent'" here, the Orange County Sheriff's Office. *See Oliver v. Baity*, 208 F. Supp. 3d 681, 688 (M.D.N.C. 2016) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). While officials sued in their official capacity are not protected by qualified immunity, "a municipality is subject to Section 1983 liability only when its 'policy or custom . . . inflicts the [plaintiff's] injury.'" *Santos*, 725 F.3d at 470 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978)). Such a "policy or custom" can give rise to municipal liability in four ways:

---

[12] There is some ambiguity as to the nature of this claim because Plaintiff states in her amended complaint both that "Blackwood is being sued in his official capacity as Sheriff of Orange County," and that her claim against Blackwood is an individual capacity suit. (ECF No. 19 at 2, 8.) In her response brief, however, Plaintiff clarified that her claim against Blackwood is in his official capacity. (ECF No. 32 at 17.) The Court will treat her claim accordingly.

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Oliver*, 208 F. Supp. 3d at 689 (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations omitted)). To survive a defendant's motion for summary judgment, a plaintiff asserting municipal liability must "present sufficient evidence to show that any alleged deprivation of his constitutional rights" sprang from one of these four sources of liability. *See id.*

Here, the Court finds that these four pathways provide no basis for holding the Orange County Sheriff's Office liable for Officer Ashley's actions. Defendants' motion for summary judgment on this portion of Plaintiff's claim must therefore be granted.

First, Plaintiff has not alleged or demonstrated the existence of an "express policy, such as a written ordinance or regulation" authorizing Ashley's violation of Crockett's Fourth Amendment rights. (*See* ECF No. 19 ¶ 59 (alleging that Blackwood's "de facto policies, practices, and customs" led to the violation of Crockett's rights).) In contrast, the record indicates that the formal "policy of the sheriff's office has always been to respect the statutory and constitutional rights of all persons," and to only use the "amount of force that reasonably appears necessary given the facts and circumstances." (ECF Nos. 25 ¶ 2; 25-1 at 2.)

Second, Plaintiff has failed to put forward any evidence that the plan to sneak up on Mr. Crockett arose through "the decisions of a person with final policymaking authority." Whether an official "possesses final policymaking authority" is a question of state law. *Oliver*, 208 F. Supp. 3d at 689. In North Carolina, such authority belongs to the Sheriff. *Id.* Here,

the plan to surreptitiously approach Crockett's home was made by Sergeant Jones, not Sheriff Blackwood, and therefore cannot create municipal liability. (*See* ECF No. 23-1 at 4.)

Third, Plaintiff has failed to provide any evidence supporting her allegation that Blackwood failed to properly train his officers. (*See* ECF No. 19 ¶ 60.) "To show municipal liability under § 1983 for failure to provide proper training, [a p]laintiff must present evidence of a policy or custom of deficient training which 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Oliver*, 208 F. Supp. 3d at 690 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Furthermore, a plaintiff "must establish a direct causal connection between specific deficiencies and a specific injury." *Id.* (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 713 (4th Cir. 1999)). Here, Ms. Crockett has made neither showing.

Finally, Plaintiff has not shown that the violation of Mr. Crockett's rights arose "through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." "It is well settled that . . . there must be 'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice." *Lytle*, 226 F.3d at 473 (quoting *Kopf v. Wing*, 942 F.2d 265, 269(4th Cir. 1991)); *see also Moody v. City of Newport News*, 93 F. Supp. 3d 516, 542 (E.D. Va. 2015). Here, Plaintiff has only alleged one instance in which a plan to "furtively apprehend" a suspect led to the application of excessive force on the suspect. This does not amount to a practice so persistent as to constitute a custom carrying the force of law.

In conclusion, the Court must grant Defendants' motion for summary judgment as it relates to Plaintiff's claim against Blackwood in his official capacity because Plaintiff's amended complaint and the evidence in the record do not establish a basis for holding the

Orange County Sheriff's Department liable for the violation of Mr. Crockett's Fourth Amendment rights.

### C. State Law Claims

In addition to her federal claims, Plaintiff brings state law claims for wrongful death, intentional, and negligent infliction of emotional distress. (ECF No. 19 ¶¶ 67–84.) Defendants argue that these claims are barred by public official and governmental immunity under state law and that, at any rate, Defendants Chelenza and Blackwood did not cause Mr. Crockett's death and so are not liable to Plaintiff for these claims. (ECF Nos. 28 at 21; 33 at 10.) The Court will first discuss the claims against the Defendants in their individual capacities.

#### 1. State law claims against Ashley in his individual capacity

Defendants argue that the state law claims against Ashley fail for two reasons. (ECF No. 28 at 21.) First, they contend that Plaintiff has "failed to allege an element necessary to overcome [Defendants'] affirmative defense of public official immunity." (*See id.* (quoting *Baker v. Smith*, 737 S.E.2d 144, 152 (N.C. Ct. App. 2012)).) Second, they argue that Ashley is entitled to public official (also known as public officer) immunity for the same reasons he is entitled to qualified immunity. (*Id.*) The Court disagrees with Defendants on both fronts.

In North Carolina, public officials "engaged in the performance of governmental duties involving the exercise of judgment and discretion" enjoy immunity from personal liability.[13] *Meyer v. Walls*, 489 S.E.2d 880, 888 (N.C. 1997) (quoting *Smith v. Hefner*, 68 S.E.2d 783, 787 (N.C. 1952)); *see Thomas v. Sellers*, 542 S.E.2d 283, 286 (N.C. Ct. App. 2001). However, public

---

[13] Sheriffs and their deputies are considered "public officers" for the purposes of public official immunity. *See Messick v. Catawba Cty.*, 431 S.E.2d 489, 496 (N.C. Ct. App. 1993).

official immunity may be pierced if it is proven that an officer's conduct was "corrupt or malicious" or "outside of and beyond the scope of his duties." *See Meyer*, 489 S.E.2d at 888 (quoting *Smith v. Hefner*, 68 SE.2d at 787). "An officer acts with malice when he 'does that which [an officer] of reasonable intelligence would know to be contrary to his duty.'" *Cooper*, 735 F.3d at 160 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)). Thus, "[p]ublic official immunity 'is unavailable to officers who violate clearly established rights.'" *Hensley*, 876 F.3d at 587 (quoting *Bailey*, 349 F.3d at 742).

Citing the North Carolina Court of Appeals' decision in *Baker v. Smith*, Defendants first argue that Plaintiff's state law claims fail because Plaintiff did not specifically allege that Defendants acted corruptly, maliciously, or beyond the scope of their authority. (ECF No. 28 at 21.) Though *Baker v. Smith* did hold that in order to survive summary judgment a plaintiff suing a public officer must allege that the defendant's actions were corrupt, malicious, or outside their authority, the opinion does not set forth any magic words requirement for *how* to make that allegation. *See* 737 S.E.2d at 152. Moreover, courts have rejected the idea that plaintiffs must use any "exact words" in their complaint to allege that a defendant is not entitled to public official immunity. *See Allmond v. Goodnight*, 753 S.E.2d 400, 421 (N.C. Ct. App. 2013) ("Although [p]laintiffs did not specifically state that [d]efendant was acting outside the scope of his official duties in those exact words, we are unable to read [plaintiff's complaint] as asserting anything other than that. . . [d]efendant was acting outside the scope of his official duties."); *Evans v. Chalmers*, 703 F.3d 636, 657 & n.16 (4th Cir. 2012) (holding that plaintiffs "sufficiently pled malicious conduct" by "alleg[ing] many wrongful acts by the officers"); *Blackburn v. Town of Kernersville*, No. 1:14-CV-560, 2014 U.S. Dist. LEXIS 170386, at *15 (M.D.N.C. Dec. 9, 2014) (rejecting defendants' motion to dismiss for failure to allege that

officers' actions were malicious or corrupt when plaintiffs "alleged multiple wrongful acts" that, if true, would have "give[n] rise to an inference that the officers acted with malice, corruption, or beyond the scope of their duties"). Here, Plaintiff's amended complaint sufficiently alleges that Ashley's conduct was malicious because, as discussed above, it alleges facts sufficient to plausibly argue that Ashley violated clearly established law. Accordingly, the Court cannot grant Defendants' motion for summary judgment on the grounds that Plaintiff's complaint failed to state an element necessary to overcome Defendants' public official immunity defense.

Next, Defendants argue that Plaintiff's state law claims against Ashley fail because "analysis of public officers' immunity is functionally identical to [analysis of] qualified immunity with respect to . . . § 1983 claims." (ECF No. 28 at 21 (quoting *Cooper*, 735 F.3d at 160).) The Court, however, has already concluded that Ashely violated clearly established law when he shot Crockett. The Court therefore finds that Ashley is not entitled to public official immunity with respect to Plaintiff's state law claims and that Defendants' motion for summary judgment on those claims must be denied.

2. State law claims against Chelenza and Blackwood in their individual capacities

While Plaintiff has shown that Ashley violated clearly established law and so acted maliciously, she has made no such showing as to Defendants Chelenza or Blackwood. Though Chelenza at least participated in the events that resulted in Crockett's death, he did not shoot Crockett and Plaintiff has conceded that Chelenza did not violate Crockett's Fourth Amendment rights. Plaintiff has therefore failed to pierce the shield of public official immunity as to Defendants Chelenza and Blackwood. The Court must therefore grant Defendants' motion for summary judgment as it relates to those claims.

3. State law claims against Blackwood in his official capacity

Finally, Plaintiff also brings these state law claims against Sheriff Blackwood in his official capacity. (*See* ECF No. 19 at 1.) "[A] suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent." *Meyer*, 489 S.E.2d at 887. Thus, the official capacity claim against Blackwood is actually a claim against the office of the Sheriff of Orange County. *See Russ v. Causey*, 732 F. Supp. 2d 589, 610 (E.D.N.C. 2010); *Boyd v. Robeson Cty.*, 621 S.E.2d 1, 5 (N.C. Ct. App. 2005).

Though the doctrine of governmental or sovereign immunity "provides 'the state its counties, and its public officials, in their official capacities, with an unqualified and absolute immunity from law suits,' . . . a sheriff may waive governmental immunity in at least two different ways." *White v. Cochran*, 748 S.E.2d 334, 339 (N.C. Ct. App. 2013) (quoting *Paquette v. Cty. of Durham*, 573 S.E.2d 715, 717 (N.C. Ct. App. 2002)). First, all sheriffs in North Carolina are statutorily required to furnish bonds to cover liabilities for wrongs committed under the color of their office, and any person who is "injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff [or his deputies], may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds." *See* N.C. Gen. Stat. §§ 162-8 and 58-76-5; *Messick*, 431 S.E.2d at 496. In effect, this statutory scheme operates as a waiver, working "to remove the sheriff from the protective embrace of governmental immunity," so long as "the surety is joined as a party to the action." *Messick*, 431 S.E.2d at 494. Second, a sheriff can waive immunity by purchasing liability insurance. *Russ*, 732 F. Supp. 2d at 610. "[B]oth the purchase of a bond and the purchase of liability insurance only operate as a waiver of governmental immunity to the extent of the coverage provided by those insuring instruments." *White*, 748 S.E.2d at 340.

Here, Defendants concede that they have waived governmental immunity up to $25,000—the value of their bond. (ECF Nos. 28 at 22; 33 at 11.) Thus, the only question is whether Orange County's insurance policy "also waives immunity and thereby provides coverage above and beyond the $25,000 bond." *See Russ*, 732 F. Supp. 2d at 610. This too appears to be uncontested. Defendants argue in their brief in support of summary judgment that "Orange County's insurance policy preserves immunity." (ECF No. 28 at 22.) In her response, Plaintiff appears to concede this issue.[14] (ECF No. 32 at 19.) She certainly does not contest it. (*Id.*) It is typically the case that a "party's failure to address an issue in its opposition brief concedes the issue," *Oliver*, 208 F. Supp. 3d at 690. The Court therefore concludes Plaintiff, having failed to contest the proposition that Orange County's insurance policy does not waive governmental immunity, concedes that Defendants are entitled to governmental immunity, except to the extent of their $25,000 bond.

## IV.    CONCLUSION

To summarize, the Court concludes (1) Ashley violated Crockett's Fourth Amendment right to be free of excessive force and, because he violated clearly established law, that he is not entitled to qualified immunity; (2) Blackwood may not be held liable in his official capacity for violating Crockett's Fourth Amendment rights; (3) Plaintiff's state law claims against Ashley in his individual capacity may go forward but; (4) Plaintiff's state law claims against Chelenza and Blackwood in their individual capacity may not advance and; (5) that Plaintiff's

---

[14] Plaintiff's only discussion of the insurance policy states: "Even if Orange County's insurance policy preserves immunity, it has been waived to the extent of the bond and dismissal is inappropriate on the basis of sovereign immunity." (ECF No. 32 at 19.)

state law claims against Blackwood in his official capacity are appropriate to the extent that Plaintiff claims against the $25,000 bond.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 23), is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to all claims with respect to Officer Chelenza; and as to all claims against Sheriff Blackwood other than the official capacity suit against him and Travelers for an amount up to $25,000. The Motion is DENIED as to Plaintiff's Fourth Amendment and state law claims against Ashley; and as to Plaintiff's official capacity suit against Blackwood and Travelers for an amount up to $25,000.

This, the 9th day of March 2020.

/s/ Loretta C. Biggs
United States District Judge